13 B.R. 15 (1981)
In the Matter of Charles R. TURNER, Millard Aviation, Inc., a/k/a B.F. Aviation, Inc., Bankrupts.
CESSNA FINANCE CORPORATION, Plaintiff,
v.
MILLARD AVIATION, INC., a/k/a B.F. Aviation, Inc., Merle Micola, as Receiver, Merle Nicola, as Trustee, and Gerald W. Turner, Defendants.
and
CESSNA FINANCE CORPORATION, Plaintiff,
v.
Charles R. TURNER, Defendant.
Bankruptcy Nos. BK78-0-854, BK78-0-1234.
United States Bankruptcy Court, D. Nebraska.
April 18, 1981.
*16 *17 *18 Steven Turner, Omaha, Neb., for trustee.
William Tinker, Wichita, Kan., for Cessna Finance Corp.
Thomas Emery, Omaha, Neb., for Gerald Turner and Charles Turner.

MEMORANDUM OPINION
DAVID L. CRAWFORD, Bankruptcy Judge.
This controversy involves title to proceeds from the sale of two airplanes financed by the plaintiff which were sold to the bankrupt prior to the filing of its petition in bankruptcy and subsequently sold by the bankrupt to third parties. The disposition of the proceeds from each airplane involves separate factual and legal issues which will be discussed separately for the sake of clarity. Each airplane will be referred to by its registration number.

FINDINGS OF FACT
General
Millard Aviation, Inc., (hereinafter Millard) was in the business of selling and servicing small aircraft. Charles Turner was president of the corporation and is also the bankrupt in a separate proceeding. Gerald Turner was the secretary and took primary responsibility for the operation of the business. Gerald Turner has not filed bankruptcy but was a managing officer of Millard after the filing of the Chapter XI.
In early 1978, Millard became a dealer for Cessna Aircraft Company and received a line of credit from plaintiff. In order to receive the credit, Millard executed a power of attorney authorizing plaintiff to execute all documents necessary to create a security interest in the airplanes financed and file the documents in the appropriate places. Charles Turner personally guaranteed the debts. During the period that Millard was a Cessna dealer, it financed seven aircraft with plaintiff. Five were sold pursuant to conditional sales contracts which were assigned to plaintiff, one was sold for cash, and one was returned to plaintiff after Millard was adjudicated a bankrupt.
Whenever Millard ordered an airplane from Cessna, plaintiff prepared and filed the appropriate documents to register the change in ownership and record the security interest. Among other provisions, the security agreement required Millard not to sell any aircraft without prior written approval of plaintiff, and, in the event of a sale, to hold that portion of the selling price required to pay the amount due on the note in trust and not commingle such funds. After the financing of an individual airplane was approved and the necessary paperwork completed, plaintiff advised an agent who was holding the plane on its behalf that the plane could be released to Millard. Millard then sent pilots to pick up the plane.
On July 17, 1978, an involuntary proceeding in bankruptcy was filed against Charles Turner. On September 20 Charles Turner converted the involuntary proceeding to a Chapter XI proceeding, but was adjudicated a bankrupt on November 6. At that time, Merle Nicola was appointed trustee for Charles Turner and receiver and standby trustee for Millard, which had filed its Chapter XI petition on October 3. On December 22, Millard was adjudicated a bankrupt and Merle Nicola appointed trustee. *19 Plaintiff was listed as an unsecured creditor on Charles Turner's schedules and as a secured creditor on Millard's.
In January, 1979, plaintiff filed an action against Millard, Gerald Turner, and the trustee alleging that Millard sold a secured airplane for cash while it was a debtor-in-possession without turning over proceeds to plaintiff. Plaintiff seeks delivery of any remaining funds, a judgment against Gerald Turner personally and against Merle Nicola in his capacity as receiver and trustee, an accounting, a claim for administrative expenses and a judgment of a nondischargeable debt against Millard. In a separate action, plaintiff seeks a judgment of a nondischargeable debt against Charles Turner based on the same transaction. The two proceedings were eventually consolidated. The registration number of the airplane involved in this transaction is N-9852C.
The trustee counterclaims for the proceeds of an airplane which he alleges was unsecured due to the filing of the bankruptcy petition prior to the filing of the security agreement with the F.A.A. The ultimate purchaser of this airplane financed the purchase with plaintiff, and plaintiff applied the proceeds first to the amount outstanding on that airplane and then to other debt. The registration number of this airplane is N-1751R.
N-9852C
Around July 17, 1978, Millard obtained possession of this airplane by the procedure described above. In late August, Don Glaser agreed to purchase the plane for the basic price of $45,885.00 plus avionics equipment costing $10,090.00 for a total price of $55,975.00. Glaser made a cash deposit of $2,000.00 at that time and $9,000.00 a few days later. Plaintiff received none of those funds. After the filing of the Chapter XI and after Millard was authorized by this court to conduct its business as a debtor-in-possession, Don Glaser paid $40,000.00, Millard by Gerald Turner executed a bill of sale and Glaser took possession of the airplane. This differs from the agreed purchase price because not all of the avionics equipment was installed. Glaser's check was deposited in the debtor-in-possession account on October 13, 1978. Gerald Turner conducted the entire transaction, knew that all proceeds should have been paid to plaintiff, and directed the deposit of the check in the debtor-in-possession account.
At the time of the deposit, the account was overdrawn. At Gerald Turner's direction, a check for $38,000.00, which was less than the amount owed on the plane, was written to plaintiff but never sent and later voided. A few days later, Gerald Turner directed the bookkeeper to write a check for $34,000.00 to plaintiff. This check was sent to plaintiff but was never signed. Gerald Turner denies knowing why the check was unsigned. On the same day the unsigned check was written, several other checks including one to Gerald Turner were written which left less than $34,000.00 in the account. By the time the receiver was appointed, checks had been written which eventually reduced the account to $25,379.94, exclusive of the check to plaintiff which was not honored, either because of the lack of signature or because of insufficient funds in the account. During this period, deposits totalling $6,633.48 were made into the account.
The trustee believed that the debtor-in-possession account was overdrawn as it was shown to be on the books and made no inquiries about the account. On December 5 or 6, the bank informed the trustee of the outstanding check to plaintiff, and the trustee then learned there was a balance in the account.2 He promptly transferred the funds to the trustee account, requested the complete records of the N-9852C transaction from the bookkeeper and turned those over to his attorney. The trustee questioned the bookkeeper about the transaction and believed the source of the funds to be "the purchase of some radio equipment and some payment towards an aircraft." He believed the check to be deliberately unsigned as a "tactic to delay Cessna from doing anything." There is no other evidence that the trustee had any actual notice of a potential secured claim to the fund. *20 The trustee did not report the funds as income in his reports to the court because the company books showed the transaction as completed in September.
Charles Turner had no actual knowledge of any of these events until after the trustee had transferred the funds to the trustee account. Charles Turner had never been actively involved in the day-to-day management of the company, although he was involved in most major decisions and did occasionally write checks on the company account. When he learned of the problem, he took no steps to advise the trustee of plaintiff's potential claim to the funds because he felt that he was no longer running the company and that any attempt to advise the trustee would have been fruitless in any event.
Plaintiff received a copy of the purchase agreement between Millard and Don Glaser on or before October 23, 1978. Plaintiff also received the unsigned check which had the registration number of the plane written on it at about the same time. On October 24, plaintiff received a field agent's report mentioning the bankruptcy proceedings and stating "This writer inspected N759Z (7.5 hrs) and N1751R (25.8 hrs). Both aircraft were located on Millard Aviation's ramp." The omission of N-9852C from this report and the mention of bankruptcy proceedings combined with the nearly simultaneous receipt of the bill of sale and the check apparently did not alarm plaintiff sufficiently to induce it to make immediate inquiry and demand for its funds, even though the reason for the field agent's visit and report was to discuss a prior check to plaintiff from Gerald Turner which had failed to clear the bank. The first evidence anywhere in the record or exhibits of a formal or informal demand for the funds is the filing of the complaint and the application for a temporary restraining order which did not occur until January 8, 1980. As a result of that application, the trustee was ordered to set aside $10,000.00 of the funds in his possession until further order.
All of the trustee's records concerning the trustee's bank account for the period at issue are in evidence. Immediately after the $25,379.94 was deposited in the account, the account also contained $2,538.00 of the trustee's funds. During the period up to the segregation of the funds, there were expenditures of $17,641.64 and deposits of $3,583.93.
N-1751R
Millard ordered this airplane a few months prior to the filing of the Chapter XI. The telex from plaintiff to its agent releasing the plane to Millard was dated September 29, 1978. Plaintiff's credit manager testified that standard procedure was not to permit delivery of airplanes without such a release and that he knew of no instance during his employment of delivery prior to release. The log books of the pilots who picked up the airplane for Millard show a delivery date of September 19; however, these logs were compiled sometime in November in order to record flight time and the dates were stated to be possibly inaccurate by "as much as two weeks" either way. Thus, according to the pilots' testimony and records, the plane might have been picked up as late as October 3, the date the Chapter XI petition was filed. I find even that date to be an approximation. The appropriate documents were filed with the F.A.A. on October 16 and recorded October 20. As previously noted, plaintiff financed the purchase of the plane and applied the proceeds of the sale first to the amount owed on N-1715R and then on another secured debt.

CONCLUSIONS OF LAW
N-9852C
At the time of the events pertinent to this suit, the 1962 version of the Uniform Commercial Code was the law in Nebraska, while the 1972 amendments were in effect in Kansas. The parties generally assume that Kansas law is applicable to issues arising from the security agreement, and I agree. In the 1962 version of the Uniform Commercial Code, the general right of parties to contractually choose the applicable law under section 1-105 of the Code is limited by sections 9-102 and 9-103. The *21 provision applicable here is the 1962 version of section 9-103(2) which provides that the law of the chief place of business of the debtor, "including the conflict of law rules," shall govern the validity and perfection of a security interest in airplanes which are not equipment or inventory of the debtor leased to others. In this case, the contract provided that Kansas law should apply to the transaction, the security agreement and the note were executed in Kansas, and the plane was delivered to the debtor in Kansas. Under these circumstances, the conflict of law rules of Nebraska would require that Kansas law apply. See Exchange Bank & Trust Co. v. Tamerius, 200 Neb. 807, 810-11, 265 N.W.2d 847 (1978); Dunlop Tire & Rubber Corp. v. Ryan, 171 Neb. 820, 825, 108 N.W.2d 84 (1961); Young v. Order of United Commercial Travelers, 142 Neb. 566, 569, 7 N.W.2d 81 (1942); Farm Mortgage & Loan Co. v. Beale, 113 Neb. 293, 294, 202 N.W. 877 (1925).
As documents governing security interests in aircraft are subject to national central filing, no overriding policy of protecting innocent parties affects these general choice of law principles.
Prior to determining whether plaintiff has rights in the proceeds of N-9852C, it is necessary to consider whether plaintiff had a security interest in the plane at the time the Chapter XI petition was filed. The parties have questioned the validity of the power of attorney, but the only evidence before me is an apparently valid executed power of attorney accompanied by an appropriate executed corporate resolution. I note that all documents signed pursuant to the power of attorney were executed prior to the filing of the Chapter XI. In the absence of any further evidence or even any mention of the issue in the parties' briefs, I decline to consider the matter further and find that the power of attorney was valid and sufficient to authorize the execution of the documents involved in this case.
The trustee then argues that the plane was sold when Millard accepted the initial down payment in August. At that point an account or contract right arose for the remainder of the purchase price. Since plaintiff never filed a financing statement covering accounts in any office, under Kan. U.C.C. Ann. § 9-306(3) the security interest became unperfected ten days later and was cut off altogether by the filing of the Chapter XI. If this theory is correct, use of the post-petition proceeds for the benefit of creditors was proper, and plaintiff's remedy is to file a claim as a general unsecured creditor. However, the theory must fail because Kan. U.C.C. Ann. § 2-401(2) provides that unless otherwise agreed title to goods passes to the buyer at the time of physical delivery of the goods by the seller. Delivery of the plane to Glaser did not occur until payment of the $40,000 check in October. Plaintiff had a valid security interest in the airplane at the time the Chapter XI petition was filed.
The trustee next argues that plaintiff had no security interest in the proceeds because the only place of filing was with the F.A.A. pursuant to 49 U.S.C. § 1403. It is true that the filing requirements of 49 U.S.C. § 1403 only preempt state law to the extent of providing a single location for filing documents affecting interests in aircraft, leaving the question of the legal effect of filing to be determined under applicable state law. E.g., Sanders v. M.D. Aircraft Sales, Inc., 575 F.2d 1086 (23 U.C.C. Rep. 1316) (3d Cir. 1978). However, this does not mean that because the federal statute applies only to the recordation of interests in aircraft, plaintiff was then required to file separate financing statements in a state office to retain a security interest in the proceeds at issue here.
These were at all times cash proceeds. Kan. U.C.C. Ann. §§ 9-306(1) & 9-105(e). Where proceeds are identifiable cash proceeds, the secured party retains a security interest if "a filed financing statement covers the original collateral." Kan. U.C.C. Ann. § 9-306(3)(b). While it might be argued that documents filed with the F.A.A. do not constitute a filed financing statement, the waiver provisions of Kan. U.C.C. Ann. § 9-302(3)(a) then come into play, stating that no financing statement need be *22 filed where a United States statute provides for national registration. Accordingly, the original filing with the F.A.A. was sufficient to perfect the security interest in any identifiable cash proceeds, particularly in view of the fact that there is no place where a party could file to perfect a security interest in cash. Kan. U.C.C. Ann. § 9-304(1).
The parties have listed as controverted issues questions of whether plaintiff consented to the sale and whether the airplane was inventory of Millard. Such questions are pertinent only to the issue of a continued security interest in the collateral. See Kan. U.C.C. Ann. §§ 9-306(2) & 9-307. As Don Glaser is not a party to these proceedings, any issue which pertains solely to his rights and liabilities in this matter is not before me. The security interest in the proceeds continues in accordance with statutory terms regardless of the consent of the secured party to the sale or the status of the collateral as inventory. Kan. U.C.C. Ann. § 9-306(2); Brown & Williamson Tobacco Corp. v. First National Bank, 504 F.2d 998, 1001-02 (15 U.C.C. Rep. 553) (7th Cir. 1974). Thus, the final general question remaining for resolution is whether the proceeds remained identifiable and traceable at all times.
This issue needs little discussion as it is already well-settled. Where a secured party's cash proceeds are commingled in a general bank account, the secured party has successfully identified the proceeds by tracing them into the account or accounts into which the deposit was made. Brown & Williamson Tobacco Corp. v. First National Bank, supra, at 1002-04; Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville, 358 F.Supp. 317, 323-24 (13 U.C.C. Rep. 109) (E.D.Mo.1973); Michigan National Bank v. Flowers Mobile Homes Sales, Inc., 26 N.C.App. 690, 217 S.E.2d 108 (17 U.C.C. Rep. 861, 865) (N.C.App.1975). At that point, a presumption arises that general payments are first made from general funds and that the security interest is only eroded as the balance in the account drops below the amount of proceeds deposited. The presumption is analogous to that which arises when a trustee commingles trust funds. Id.
The cases cited have applied this presumption in cases where the party who commingled the funds remained in control of the account. However, for several reasons, I think the presumption should continue to apply when the funds come into the hands of a third party who is a successor to the commingling party such as the successor receiver-trustee in this case.[1] First, despite the trust analogy, the tracing rule as developed in the cases cited seems to be based on the concept of title to property rather than on the intent of the party using the account. Thus, the good faith of a successor trustee would be immaterial to the right of a secured party to trace and assert title to funds in an account, although good faith would be material to the issue of liability for diminution of the collateral. Second, read together, Kan. U.C.C. Ann. §§ 9-301 and 9-306(3)(b) provide that a lien creditor without notice that the funds in the account were proceeds could not prevail against the secured party. See Michigan National Bank v. Flowers, supra. Third, even if a lien creditor without notice had rights in such an account, the trustee's lien creditor status exists only as of the time of filing the Chapter XI petition at which time the plaintiff in this case had a valid security interest in the airplane itself. Bankruptcy Act § 70(a)(5) and (c). For these reasons, I hold that plaintiff's security interest in identifiable proceeds continued after the proceeds were transferred from the debtor-in-possession account to the trustee account. The proceeds set aside by the trustee pursuant to my order constituted essentially all of the proceeds remaining in the trustee's account, and plaintiff is entitled to take possession of those funds as well as any interest they have earned.
*23 Several other issues raised by the parties require only brief comment. I find no evidence anywhere in the record of explicit or implicit waiver of rights to the funds by the plaintiff except as hereafter discussed regarding the trustee. Second, all questions of whether Millard's contract with plaintiff was executory at the time of filing are moot in light of the fact that Millard completed the sale of the airplane after filing and used the proceeds for its own benefit. A party may not accept the benefits of a contract while rejecting its burdens. 4A Collier on Bankruptcy, para. 70.43(3) n. 21 at 526 (14th ed. 1978). Finally, an order from this Court authorizing a debtor-in-possession to operate a business does not generally authorize the taking of a secured party's collateral for the general benefit of creditors, and did not in this case.
Given this resolution of the general issues, it is now necessary to consider the issues pertaining to the liability of the individual defendants. While all questions concerning the validity and effect of plaintiff's contract with Millard have been determined according to Kansas law, Nebraska law and the appropriate Bankruptcy law apply to the issues of duties and liabilities of the defendants. Restatement (Second) of Conflict of Laws §§ 302 and 309 (1971); Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 314, 6 L.Ed. 606 (1827). As this proceeding was filed prior to enactment of the present Bankruptcy Code, the former Bankruptcy Act controls. Bankruptcy Reform Act of 1978, Pub.L. 95-598 § 403.
Nondischargeability Issues
Plaintiff has requested that the debts of Millard and Charles Turner regarding this transaction be held nondischargeable on the basis of sections 17(a)(2), (4) and (8) of the Bankruptcy Act. Charles Turner was never personally involved in the Glaser transaction, and it is unlikely that plaintiff could prevail against him in any event. However, it is not necessary to discuss that issue, as I find that plaintiff cannot even prevail against Millard on this issue. At the time of filing, Millard still had possession of and title to the plane and had the power to return it to plaintiff. Only $11,000 had been received on the Glaser contract, most of which was to enable Millard to install avionics equipment on the plane. Enough remained due on the Glaser contract to enable Millard to pay plaintiff in full, and there has been no showing that Millard did not intend to do so. Under the circumstances, I find that Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), is controlling and that the prefiling conversion, if any, did not give rise to a nondischargeable debt. Of course, nondischargeability issues are inapplicable to the post-petition portion of the transaction. Bankruptcy Act §§ 17(a) & 63.
Liability of Millard and Gerald Turner
An initial issue is whether this Court has jurisdiction over Gerald Turner in this matter. It is stipulated that service of process was made upon Gerald Turner by first-class mail. Under Bankruptcy Rule 704, service by mail is sufficient. As the managing officer of the debtor-in-possession, Gerald Turner was an officer of this Court and may be sued in this Court concerning his dealings with property of the estate. Bankruptcy Act §§ 342 & 343; Wolf v. Weinstein, 372 U.S. 633, 649-50, 83 S.Ct. 969, 979-980, 10 L.Ed.2d 33 (1963); see also 6, part 2, Collier on Bankruptcy, para. 8.10 at 1412 (14th ed. 1978); 28 U.S.C. § 959. Accordingly, the jurisdictional objections are without merit.
The evidence is overwhelming that Gerald Turner transferred plaintiff's collateral to a third party and willfully and knowingly retained the proceeds for the benefit of Millard. Accordingly, Gerald Turner is personally liable to the plaintiff for the damages it has sustained by reason of his actions. Doyle v. Union Insurance Company, 202 Neb. 599, 608, 277 N.W.2d 36 (1979); see also 3A Fletcher, Cyclopedia of Corporations § 1140 at 221 (Perm. Ed. 1975). The amounts paid by Don Glaser were sufficient to pay plaintiff in full. Therefore, plaintiff's damage is the contract price of the airplane, $44,951.76, less *24 any recovery by plaintiff from other sources. Gerald Turner was not a party to Millard's contract with plaintiff, and I do not believe it is appropriate to use the contract rate of interest. Accordingly, prejudgment interest will be allowed at the statutory rate of six percent from October 13, 1978, and postjudgment interest at eight percent. Foxley Cattle Co. v. Bank of Mead, 196 Neb. 1, 7, 241 N.W.2d 495 (1976); Neb.Rev.Stat. § 45-102 & 103. As Gerald Turner's actions were clearly within the scope of his employment, Millard is also liable to the plaintiff. Watts v. Zadina, 179 Neb. 548, 139 N.W.2d 290 (1966); see also 10 Fletcher, Cyclopedia of Corporations § 4894 at 463 (Perm. Ed. 1978). In Millard's case, pre and post judgment interest will be allowed at the contract rate. Neb.Rev.Stat. § 45-103.
Liability of Charles Turner
Corporate officers are not generally liable for the torts of other officers unless they participated in the transaction or benefited from it. Charles Turner cannot be liable to plaintiff for this transaction unless he breached a duty he owed to the plaintiff. Department of Banking v. Colburn, 188 Neb. 500, 198 N.W.2d 69 (1972); Johns v. Haase, 186 Neb. 55, 180 N.W.2d 689 (1970); see also 3A Fletcher, supra, §§ 1070 & 1089 at 86 & 113. There is no evidence to show that Charles was negligent in entrusting the management of the corporation to Gerald, and I find that Charles's failure to learn of the transaction promptly did not constitute negligence. At most, Charles had a duty to attempt to remedy the situation when he did learn of it. However, this lawsuit demonstrates that any attempt by Charles Turner to tell the trustee to turn the funds over to plaintiff would have been fruitless. I hold that any negligence of Charles Turner was not the cause of damage to the plaintiff.
Liability of the Trustee and the Estate
The general rule regarding trustee liability is that trustees are liable only for actions beyond the scope of their authority or for negligence while acting within their authority. E.g., Sherr v. Winkler, 552 F.2d 1367 (10th Cir. 1977); United States v. Sapp, 641 F.2d 182 (7 B.C.D. 470) (4th Cir. 1981); 1 Collier's on Bankruptcy, para. 2.28(4) at 234-35 & 2.30 at 240.2-3 (14th ed. 1979). It is clearly within the duties of a trustee to collect the property of the estate and administer the estate for the benefit of creditors. Imperial Assurance Co. v. Livingston, 49 F.2d 745, 748 (8th Cir. 1931). Accordingly, the question in this case is whether the trustee acted negligently in failing to discover plaintiff's secured claim prior to taking and using the funds from the debtor-in-possession account.
The facts show that the trustee had notice of the existence of the unsigned check to plaintiff and of plaintiff's status as a secured creditor with regard to other airplanes held by the estate. It is a fair inference that the trustee knew or should have known that the unsigned check was in payment for an airplane which at one time was plaintiff's collateral. There is no evidence that the trustee knew or should have known that the funds in the account were actually proceeds of collateral and subject to plaintiff's lien. At most, the use of the funds was a mistake in judgment for which trustees may not be held liable. Sherr v. Winkler, supra, at 1376.
Even if the trustee's conduct were held to be negligent, plaintiff would be barred from suing him individually due to neglect which, under the circumstances, amounts to laches. Plaintiff knew in October that the plane had been sold and the proceeds deposited in a general bank account. Plaintiff also knew about the bankruptcy proceedings at that time. By prompt action, plaintiff could have made its claim to the proceeds known before the trustee was ever involved in the case. While a delay of nearly 90 days should not bar plaintiff from its other remedies, I hold that it does bar a finding of liability against a relatively innocent party where prompt action could have avoided a substantial part of the damages.
*25 As plaintiff's proceeds were used for the benefit of the estate by both the debtor-in-possession and the trustee, plaintiff is entitled to a priority claim for administrative expenses pursuant to section 64 of the Bankruptcy Act.[2]Reading Co. v. Brown, 391 U.S. 471, 485, 88 S.Ct. 1759, 1766-1767, 20 L.Ed.2d 751 (1968). The priority claim should be allocated between the Chapter XI and the Chapter 7 proceedings according to the time when actual disbursements were made from the $40,000 fund. Plaintiff will be given leave to amend its proof of claim filed June 26, 1979, to reflect this holding.
Accounting
Plaintiff has requested an accounting from Gerald Turner and from the trustee. All of the bank records of both parties are in evidence in this matter. I find that a sufficient accounting has been made and will deny the request.
N-1751R
The trustee's theory is that plaintiff was an unperfected secured creditor at the time the petition was filed and that the filing of the security interest with the F.A.A. was too late to relate back to the date when Millard took possession of the plane. See Kan. U.C.C. Ann. § 9-301(2). However, if Millard did not take possession of the plane prior to filing its Chapter XI, plaintiff's security interest was perfected at that time, and the trustee's avoiding powers would be inapplicable to any subsequent gap in perfection. I find the evidence as to the date Millard took possession of the plane to be completely unreliable. From the evidence before me, delivery of the plane after filing of the Chapter XI is at least as probable as delivery before that date. Accordingly, the trustee has failed to sustain his burden of proof and the relief sought must be denied.
Defendants Charles and Gerald Turner moved to file amended answers seeking, among other things, to set off against any judgments against them any recovery had by the trustee on this claim. Leave to file is granted, but in view of my holding the setoff issue is moot. The other issues raised in the amended answers have been dealt with earlier in this opinion.

SUMMARY
Plaintiff had a valid perfected security interest in proceeds of N-9852C which Millard and Gerald Turner willfully converted to Millard's use. Plaintiff is entitled to judgments against Millard and Gerald Turner but not Charles Turner, who did not participate in or know of the conversion. Plaintiff is also entitled to claim any of its funds traced into the trustee's hands but may not have a judgment against the trustee because the trustee was not negligent and because plaintiff unduly neglected notifying the trustee of its claim. Plaintiff is entitled to an administrative expense claim for proceeds spent during this proceeding. The trustee has failed to sustain his burden of proof on the counterclaim and the relief sought must be denied.
A separate judgment is entered in accordance with the foregoing.
NOTES
[1] Kan. U.C.C. Ann. § 9-306(4) specifically deals with the cases in which funds are commingled prior to filing bankruptcy. The holding in this case is applicable to a narrower category of cases in which funds are commingled after filing.
[2] If the proceeds had not been used to pay expenses of these proceedings, there would remain those unpaid expenses which would be administration expenses. Plaintiff's allowance of an administration claim is merely by way of substitution of it for the other expenses.