### In re UNITED PUERTO RICAN FOOD CORP., Debtor.

### Bankruptcy No. 182–11769–21.

United States Bankruptcy Court, E.D. New York.

June 22, 1984.

---

**566**

Finkel, Goldstein & Berzow, New York City, for debtor (after Feb. 1983).

Bibiano Rosa, New York City, for debtor.

Raymond J. Dearie, U.S. Atty., E.D. of N.Y., Brooklyn, N.Y., for Small Business Admin.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge.

In this liquidating Chapter 11 proceeding several issues have arisen relating to the secured claim held by the United States Small Business Administration ("SBA"). The debtor herein, United Puerto Rican Food Corp. ("UPRFC"), the operator of a small supermarket, filed for relief under Chapter 11 of Title 11 on July 9, 1982. At the time it filed its petition it was indebted to the SBA in the amount of $130,000 as a guarantor of an obligation incurred by Tercera Food Corporation ("Tercera"). As security, SBA held a security interest in all the debtor's fixtures, equipment and inventory.

On June 10, 1983 the debtor sold its entire business, except its inventory, to an unrelated purchaser. By June 10, 1983 the debtor had disposed of virtually all its inventory itself. The price received for the business was $180,000; the only sale the debtor had authority from the bankruptcy court to make was a sale of all its assets, including inventory, for $200,000. The SBA now makes two requests: first, it requests that out of the proceeds of the sale it be allocated $38,345 as the value of the fixtures and equipment covered by its lien; second, it requests that it be allowed an administrative expense in the amount of $27,700 and that this expense be given super-priority status pursuant to 11 U.S.C.

§ 507(b). This figure is made up of two components: the value of the inventory that should have been sold on June 10, 1983 but was not and the attorney's fees incurred in uncovering the facts respecting the elimination of the inventory from the sale and sale price.

To put the SBA's motion into context, some background is necessary.

What apparently precipitated the debtor's recourse to Chapter 11 was its inability to meet the $3,000 monthly payments it had agreed to make in settlement of a final judgment for unpaid rent in the amount of $27,759.89. Apart from the landlord, the debtor's schedules listed only three general creditors, and as to two, the debt was disputed. No creditors' committee has ever functioned in this case. The debtor's principal creditors were the various tax authorities to whom it showed debts, albeit disputed, of close to $72,000 and the SBA, to which it owed $130,000. The SBA is the debtor's largest creditor.

On November 5, 1982, the debtor entered into a contract to sell all its assets to Tahameh Ltd. ("Tahameh") for the sum of $200,000, free and clear of all liens. With respect to inventory, the contract provided:

> "Seller represents that at the time of closing there shall be at least $26,500 in inventory. Inventory man to conduct appraisal no later than 24 hours prior to closing. Cost of inventory to be shared by parties. Any amount over $26,500, purchaser to reimburse seller at wholesale".

Neither the SBA nor the Court was advised of the debtor's contract to liquidate its entire business until February, 1983, when the debtor, which until that point had been represented by Bibiano Rosa, Esq., applied to retain, in addition, Finkel, Goldstein & Berzow, a firm of experienced and respected bankruptcy practitioners.

Mr. Finkel promptly brought on by order to show cause a hearing on February 18, 1983 having as its purpose approval of the

contract entered into with Tahameh.[1] At the hearing the contract was described by the debtor's attorneys as a sale of all the assets of the debtor for $200,000, including $25,000 in inventory. Respecting the proposed sale, Mr. Finkel said:

"This debtor is in the supermarket business. Apparently, after filing the petition, they found it difficult to operate at a profit, because of the fact that they were unable to get fresh capital, and so forth. Fortunately, I say fortunately advisedly, the company was able to get a purchaser to purchase the assets for $200,000. The assets consist of a lease, equipment, supermarket equipment and inventory. The inventory [is] somewhere between $35,000 and $40,000. It fluctuates.

Now, there are certain liens and encumbrances and so forth. We feel that it's not only good for the debtor, but good for the creditors to see to it that this $200,000 transaction be completed. It may not be $200,000. It may be a few thousand less, because the contract provides that at the closing there must be at least $25,000 worth of inventory. Now if the inventory is a few thousand dollars less, then we will get a few thousand dollars less and an adjustment. But more or less it will amount to almost $200,000". Tr. 2/18/83 at 2–3.

The Assistant United States Attorney, representing the SBA, advised the Court that he had been unable to determine from the file what the terms of sale were, but that if what was contemplated was "a sale for all cash, $200,000, we would have no objection to the sale because what is owed to the SBA is $130,000". Tr. 2/18/83 at 5. He then added:

"Presumably, therefore, we would get paid in full. So as long as the money was held in escrow and our lien attached to the proceeds, we wouldn't have any objection to the sale. I think we are entitled to that under Section 363 F. [sic] of the Code, which says there must be adequate protection".[2]

On February 25, 1983, this Court entered an order which, after noting that the SBA had no objection to the sale, "provided that the lien of the Small Business Administration and the Director of Internal Revenue Service be attached to the proceeds pending determination of the dispute by the debtor in possession of the extent and validity of said liens", authorized the debtor, upon payment of $200,000, less deductions for inventory and back rent, to deliver to the purchaser a bill of sale and assignment of lease "free and clear of all liens, taxes and debts of whatsoever kind and nature". Order of Feb. 25, 1983.

Sometime after the contract was entered into by Tahameh in November, 1982, its President, Norman Nagi, became disturbed by the fact that on each of his visits to the debtor's premises he found less and less. To protect his firm he changed the agreement with the debtor, as he related to the attorney for the SBA during a deposition taken on November 9, 1983:

Q. ... Now, I am concerned about the original agreement that you had in November, 1982 and correct me if I am wrong, the sale was to be for $200,000 and on the date of closing there was to be $26,500 in inventory; is that correct?

A. Right.

Q. Back in November of 1982 when you made the original agreement, how did you arrive at that figure of $26,500? Explain in the best way you can.

A. That $200,000 was for everything in the store. I mean the shelves.

Q. Yes.

A. The cash registers.

Q. All the groceries?

---

1. Because time was represented to be of the essence, short notice of the sale was authorized, although the contract had been negotiated three months earlier and the sale did not close until four months later.

2. 11 U.S.C. § 363(f) permits sale by a trustee free and clear of outstanding liens only under certain conditions, one of which is that

"(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest".

A. All the groceries.

Q. Yes.

A. Then every day something is missing from the store. I go there about every two weeks, you know.

Q. Yes.

A. So, I said something is missing from the store and we do adding of everything, piece by piece. We just get everything in the store. So, I said a lot of things is missing and I said well let's talk about that, I am not going to go through with the deal how we agreed. Then, we took of 20,000. He said 26, what we agreed is inside the store. What we got inside the store.

Q. Yes.

A. So, forget about the $6,500, just take off the $20,000 and I owe you 180, United Puerto Rican Food.

Q. That was the second agreement, you took off $20,000 off the purchase price?

A. Right.

Declaration of Michael A. Mulqueen, Assistant United States Attorney ("Declaration"), Ex. C, Deposition of Norman Nagi, November 9, 1983 at pp 26–27.

The change in the agreement from a sale for $200,000 of a functioning supermarket, including inventory, to a sale of $180,000 of an empty store was memorialized in two letters dated March 21, 1983 and April 8, 1983 sent UPRFC's attorney, Bibiano Rosa, Esq., by Tahameh's attorney, Stephen N. Erlitz, Esq. Exhs. F and G to Declaration. In the first letter, Tahameh's attorney points out the expense to which forfeiting the inventory will put on his client, saying:

"In view of the fact that the parties have agreed to reduce the price to $180,000, which now is to exclude the merchandise in the store, it will be necessary for my client to invest substantial sums of money to stock the store at the time of the closing".

The second letter "amends" the earlier letter and then goes on to describe the renegotiated agreement in the following artificial way:

"The purchase price as recited in the initial agreement was $200,000.00, which was supposed to include $25,000.00 worth of inventory at the time of closing.

You have advised me that there will be in fact, no inventory on the premises at the time of closing.

The purchaser agrees that the price shall remain at $200,000.00, which includes the $25,000.00 worth of inventory recited in the original contract and the price is to be reduced proportionately based upon the reduced amount (none) of inventory on the premises at the time of the closing, but it is further agreed that in no event shall the price be reduced below the sum of $180,000.00".

Neither the Court nor the SBA was advised of this significant change in the terms of the sale as authorized by the Court: one which permanently reduced the total price by $20,000 and eliminated from the sale the debtor's entire inventory which, according to its schedules, had a value of $50,000 at cost when it filed. Nothing was said about the elimination of the inventory from the sale even when the debtor applied on April 14, 1983 for authorization to modify the original agreement from an all-cash deal to one for cash and notes. On the contrary, the order prepared for the signature of the Court by the debtor's attorney scheduling a hearing on the proposed modification described the only change being made as follows:

"... a modification of the offer heretofore made by Tahameh Ltd. to purchase the assets of the Debtor in Possession for the sum of $200,000.00 *inclusive of the inventory* on the terms set forth in the annexed Application with payment of $120,000.00 on the date of closing and the balance in monthly installments of $750.00 per month ..." [emphasis supplied]

Order to Show Cause, signed April 14, 1983.

A description of the offer as still one for the debtor's assets "inclusive of the inventory" when both parties had agreed that the price was "to exclude the merchandise

in the store" was deliberately misleading and false to the facts.

The application signed by Bibiano Rosa in support of the only modification of which he informed the SBA, the debtor's creditors and the courts, was similarly designed to conceal the radical change which the parties had made in the deal without court authorization. Mr. Rosa's application implicitly represented that the only modification in the agreement since it had received the approval of the Court was the proposed change from an all-cash to a part-cash deal. Sale of the debtor's assets in accordance with the debtor's application was authorized on May 6, 1983.

On May 10, 1983, George Leontis & Co., Inc. appraised the fixtures, machinery and equipment on the debtor's premises. The appraisor calculated three values for these assets: (1) "forced value", (2) "fair-market value", and (3) "in-place value". Forced value was $8,840; fair-market value was $14,925; and in-place value was $38,345. One reason for the difference in results was the higher or lower value assigned specific assets; a second was that a number of items were given no value, except in the in-place valuation. The inventory was not appraised.

The sale to Tahameh finally took place on June 10, 1983. By that time the debt to the landlord for back rent had grown to the point where it was necessary to pay the landlord $57,500 to secure its agreement to the assignment of the lease.[3] Evidently, nothing or very little had been paid to the landlord for use and occupation during the Chapter 11 proceeding despite the Court order directing such payments. Tr. 9/20/83 at 21.

As the parties had agreed, no inventory was transferred and no portion of the purchase price was attributable to the debtor's stock. The SBA received its first intelligence that no part of the purchase price covered the inventory when on August 16, 1983 UPRFC's attorney filed an application to determine the value of the SBA's security interest which stated that "[t]he inventory at the date of sale was valued at $1,233.51, but in view of the condition of said inventory it was not taken by the purchaser but it was turned over to the debtor in possession which now holds same.... This inventory is now available to the secured party if it desires to have the same transferred to it". The application misstated the facts since whatever the condition of the inventory, it had been previously agreed between the debtor and the purchaser that the latter would buy none of it.[4]

At the hearing the debtor's attorney, Mr. Finkel, relying on what he had been told by Mr. Rosa, explained the absence of inventory as follows:

Now, the original sale was set for $200,000, which was to include the inventory. When it came to the question of the sale, they found that the inventory was very, very little. The reason that it was very little, was due to the fact that the debtor in possession was not able to generate credit and take in merchandise, which resulted in the inventory being reduced.

Now, at the sale the agreement was that if we don't give them a certain amount of inventory, they don't have to take it. So the inventory was omitted and we realized $175,000 of which there

---

3. Initially the landlord was paid $50,000 out of the proceeds from the sale to Tahameh and permitted to retain a $3,750 security deposit. The sum of $7,500 was placed in an escrow fund to cover the cost of a needed repair and subsequently was released to the landlord, by order of the Court.

4. Although the application was prepared by Mr. Finkel the Court wants to make it clear that it does not consider him in any way responsible for what has taken place here. Mr. Finkel is a

respected practitioner in this Court and a man of the highest integrity. He will not be the first nor last lawyer whose personal probity has been taken advantage of by a client. Mr. Finkel was apparently retained solely to steer the debtor through the labyrinth of bankruptcy. All that Mr. Finkel knew about the matter, as he advised the Court, was what he was told by Mr. Rosa. Tr. 9/20/83 at 13. Evidently, Mr. Rosa kept his co-counsel no better advised than the SBA or the Court.

was $120,000 in cash and the balance was by notes, which are being collected now by us as attorneys for the debtor, co-attorneys for the debtor in possession. Tr. 9/20/83 at 3.

When the Court indicated that it could not believe that a functioning supermarket could have so little inventory, Mr. Finkel responded:

MR. FINKEL: That's what I was told by the attorney who represented the debtor all the way through up to the time that it came before your Honor. I didn't have personal knowledge of the fact, other than what they told me. Then when I asked them what about the inventory before the closing took place, they said, well, we weren't able to operate, and they closed the place for awhile I understand. *Id.* at 13.

The SBA then launched its own investigation which uncovered the change made in March in the terms of sale and showed up as false the explanation given by the debtor-in-possession for the fact that no inventory was taken by the purchaser.

The SBA was unable to ascertain, however, what had become of the inventory or its proceeds. The debtor's president, Jose Sepulveda, denied any knowledge of sales records and gave ever changing explanations of what had been done with the proceeds. Declaration, Ex. D, Rule 2004 Hearing of Jose Sepulveda held on November 15, 1983, at pp 30, 36. Initially, he claimed that the proceeds were used to pay off "some of the small creditors, that is how you call them, some of the small creditors that we had at the time so, we took that inventory, we keep selling the inventory and paying these people". *Id.* at 32. But he had difficulty recalling who these creditors were and of the three creditors (other than the landlord) listed in the debtor's schedules, he denied making any payments to the two smallest. *Id.* at 34–36.

When the question was repeated, he changed his answer slightly: "Some of the smallest creditors and we used some of that money to pay the rent, to pay Con Edison, to pay the people that was working

in the store at that time, some of the people that was working in the store". *Id.* at 32–33. But the reason the landlord took such a large bite out of the proceeds from the Tahemeh sale—$50,000—was because of the arrears accumulated during the Chapter 11 proceeding. As for the people working in the store who were paid, Sepulveda identified them as his brother-in-law, Efran Troche, and his brother, Roberto Sepulveda, both stockholders. *Id.* at 33–34.

Based on the foregoing facts, the SBA moved, pursuant to 11 U.S.C. § 503(a), and Rules 9013 and 9014 of the Bankruptcy Rules, for an order allowing it a super-priority administrative expense in the amount of $27,700, consisting of the value of the inventory in the amount of $26,500 and attorney's fees in the amount of $1,000. Still pending before the Court is also the issue of the value of the SBA's security interest in the debtor's assets.

At the hearing on SBA's application, UPRFC did not contest the facts relied on by the SBA. Its position rather was that the inventory was sold in the ordinary course of the debtor's business, as permitted by the Code, and that the SBA should have obtained a protective order which it failed to do and could not now complain. Tr. 3/27/84 at 9–10.

## DISCUSSION

The issues before the Court are: what was the value of the security held by the SBA on the debtor's physical assets; what are the rights of the SBA in view of the unauthorized liquidation of the inventory covered by the SBA's security interest; and how much of the SBA's $130,000 claim is unsecured.

UPRFC contends that the value of the SBA's security interest is what it would have realized on a forced sale of the fixtures and equipment, $8,840 plus the value of the inventory on hand at the closing with Tahameh, $1,233.51, or a total of $10,073.51. Application dated 8/10/83.

The SBA claims that it is entitled

(1) to the value of the debtor's fixtures and equipment in place, or $38,345, to be paid out of the proceeds of the sale to Tahameh, and

(2) to a super-priority administrative claim in the amount of the value of the inventory which was to be included in the sale but for which the debtor is now unable to account, plus attorney's fees.

As to the equipment, the key question is what value is to be used. Is the value of SBA's security interest in the debtor's equipment and fixtures: forced sale value, fair-market value or in-place value. Neither the Code nor the cases provide any clear guidance on this issue. It appears to be one that is left largely to the discretion of the bankruptcy judge. 3 *Collier on Bankruptcy,* ¶ 506.04[2] at 506–21 through 506–33, (15th Ed.1984.)

What has occurred here, is a sale of a total supermarket as a functioning enterprise. The value realized on the sale was necessarily an in-place value. Apart from the lease it is difficult to see what was sold except the equipment, machinery and fixtures in which the SBA had a security interest. In these circumstances, the value that should be assigned to the SBA's lien is the value the liened assets had in terms of the sale that was actually made. The goods were sold in-place and, therefore, SBA is entitled out of the proceeds of such sale to the value of the assets in-place, or $38,345.

The inventory presents a more difficult question. To appreciate what has occurred here some understanding of the structure and objectives of the Bankruptcy Code is helpful. The Bankruptcy Code is intended to protect and facilitate the rehabilitation of troubled businesses while at the same time protecting their creditors.

As soon as a petition for relief is filed under Title 11 the automatic stay imposed by 11 U.S.C. § 362 stops all collection efforts and the enforcement of any liens against the debtor's property. Protected by this stay, the troubled business can continue to operate. 11 U.S.C. § 1108. No trustee is appointed. Rather the debtor becomes a debtor-in-possession with all the rights and duties of a trustee. 11 U.S.C. § 1107. Among those duties is to "be accountable for all property received". 11 U.S.C. § 704(2).

A debtor-in-possession engaged in its operation of a business needs no court order to continue selling property, including property subject to a security interest, if the sale is made in the ordinary course of that business. 11 U.S.C. § 363(c).[5] However, any sale of property other than in the ordinary course of business can take place only after notice and a hearing. 11 U.S.C. § 363(b). The Bankruptcy Rules formerly required ten days' notice to all creditors; now twenty days is necessary. Former Bankruptcy Rule 203(a); 2002(a).

Property subject to liens may be sold free and clear of such liens only if one of several conditions is met, one being that the creditor consents. 11 U.S.C. § 363(f).

Sales by the debtor, even sales in the ordinary course of business, can be prohibited or made subject to conditions upon request by a secured creditor if necessary to provide that creditor with adequate protection. 11 U.S.C. § 363(e).

The Code does not define what constitutes adequate protection except to say that it is such relief "as will result in the realization by such entity [the secured creditor] of the indubitable equivalent of such entity's interest in such property". 11 U.S.C. § 361.

UPRFC claims that its liquidation of its inventory was consonant with the authorization given it by the Code to sell its property, even secured property, in the ordinary course of its business. It was up to the

---

**5.** Section 363(c)(1) provides:

"If the business of the debtor is authorized to be operated under Section 721, 1108, or 1304 of this title, and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing".

SBA, the debtor argues, to have applied for a protective order regarding the sale of the inventory, and the SBA having failed to do so cannot now complain of what has occurred. That contention is without merit for two reasons: first, the sale of the inventory was not in the ordinary course of business since it is not the ordinary course of any business to engage in its own liquidation; second, in view of the representations made by the debtor to both the SBA and the Court as to how the inventory was to be sold, the SBA had no reason to apply for a protective order and, therefore, cannot be faulted for not having done so.

Up to November 5, 1983, when UPRFC entered into its agreement with Tahameh it was engaged in the ordinary course of business of a supermarket. After that date, it was committed to liquidating its assets.

Until February 18, 1983, however, the SBA had no way of knowing that UPRFC, which had invoked Chapter 11 to rehabilitate itself, according to the statement filed with its petition, was now committed to its own liquidation. The manner of liquidation of which UPRFC sought authorization was not the slow liquidation of its inventory by itself but a sale of its entire business, including inventory, for a total price of $200,000. Since this price substantially exceeded SBA's lien it had no reason to apply for additional controls and safeguards to insure itself of adequate protection.

Had the debtor when it changed its agreement with Tahameh so as to exclude all inventory from the sale so advised the SBA, that organization could have taken whatever steps it deemed appropriate to protect its security interest in such inventory. It does not now lie in the mouth of the debtor to rely on inaction which was induced by the debtor's concealment of the true terms of its contract with Tahameh. If the SBA failed to assure itself of adequate protection, it is not due to any inadvertence by it but to reliance on statements that have proved, to put it mildly, inaccurate.

It can be anticipated that the debtor will claim that there was no deviation from the original agreement with Tahameh because that agreement did not call for the transfer of any specific quantity of inventory but rather provided for an adjustment in the price to be paid depending upon the quantity of inventory actually delivered. In other words, the delivery of *no* inventory was wholly consistent with the agreement requiring only that the purchase price be adjusted downward by $26,500.

Several things would be wrong with such a claim. First, assuming the original agreement did not necessarily include any inventory, there was certainly a change when the first agreement was amended to provide that if no inventory were delivered as parties now agreed, the purchase price would be reduced not by $26,500, but by $20,000. Indubitably, that was a change of which nobody was advised. The second and more fundamental objection is that there is a radical difference between an agreement which contemplates the transfer of an operating supermarket fully stocked, with minor adjustments to be made in the purchase price for what is necessarily a fluctuating inventory, and an agreement to transfer a business the shelves of which have been stripped bare. The difference is of a character as would in other circumstances support an action for fraud. *Cf. Rothenberg v. Kamen*, 735 F.2d 753 (2d Cir.1984).

The SBA contends that the debtor's unauthorized piecemeal liquidation of its inventory violated the debtor's duty under 11 U.S.C. §§ 204 and 1107(a) to protect and preserve its assets and also violated the May 6, 1983 order authorizing a sale "inclusive of inventory". What has occurred here, the SBA asserts, constitutes the tort of "conversion" under the common Law of New York where such an action will lie against a fiduciary for abuse of his trust. 23 N.Y.Jur.2d, Conversion §§ 35, 42 at 248–49, 258–59 (1983).

It is well recognized that conversion is a tort. It is also settled doctrine that tort claims arising during the course of a Chap-

ter 11 proceeding are "actual and necessary" administrative expenses within the meaning of 11 U.S.C. § 503(b)(1)(A). *Reading Co. v. Brown*, 391 U.S. 471, 482, 88 S.Ct. 1759, 1765, 20 L.Ed.2d 751 (1968); *Carter-Wallace, Inc. v. Davis-Edwards Fhrmakal Corp.*, 443 F.2d 867, 874 (2d Cir.1971); *Matter of Turner*, 13 B.R. 15, 24–25 (Bkrtcy.D.Neb.1981); *In re Allan Wood Steel Co.*, 2 B.R. 161, 163 (Bkrtcy.E.D.Pa.1980). Accordingly, the SBA requires that it be given an administrative claim for the minimal value of its inventory converted by the debtor, $26,500. Memorandum, p. 12.

The SBA claims it is also entitled to an allowance for the attorneys' fees it incurred in uncovering UPRFC's fraudulent conduct. It invokes Section 503(b)(3)(D) which authorizes attorney fees to a creditor who makes a substantial contribution to a case under Chapter 9 or 11.

SBA claims further that it is entitled, not only to have the conversion deemed an administrative expense, but to have its claims given super-priority pursuant to 11 U.S.C. § 507(b).[6] It also requests such super-priority for its attorneys' fees.

The super-priority given by § 507(b) is intended to give the secured creditor additional protection "to the extent the protection [under Section 361] proves to be inadequate after the fact ..." 24 Cong.Rec. H17–092 (Daily Ed., September 28, 1978). See *In re Callister*, 15 B.R. 521 (Bkrtcy.D. Utah 1981). The SBA urges that this is just such a case, that it requested adequate protection at the February 18, 1983 hearing on UPRFC's application to sell its business to Tahameh, and that adequate protection was intended to be provided by the order of this Court conditioning approval of the sale on (1) the proceeds of sale being held in escrow; (2) the SBA's lien attaching to said proceeds; (3) the direction that the sale be "inclusive of inventory". It is undisputable that events have proved that SBA's interest has been eroded, nevertheless.

The Court agrees that for the reasons urged by the SBA, that if what the debtor did constituted the tort of conversion that the SBA would have a super-priority administrative claim in the amount of at least $26,500, but the Court prefers to arrive at the equivalent result by a more direct method. Its preference is due in part to the fact that the Court questions whether the determination that a common law tort has occurred does not require a full adversary proceeding, although it notes that no procedural objection has been raised by the debtor, and also to the fact that it questions whether the debtor's improper and unauthorized disposition of its property constitutes a conversion of it.

Instead of creating an administrative expense the Court deems it preferable to dispose of the SBA's claim in the context of its right to the proceeds of the sales by the debtor of the liened property free and clear of the SBA's lien.

The debtor applied for and was given authority to sell its assets free and clear of the lien of the SBA with that lien to attach to the proceeds. At the time the Court authorized such sale the SBA had a security interest in equipment, if sold in-place, of a value of $38,345 and an inventory of at least a value of $26,500 (plus or minus the ordinary day-to-day fluctuations in an operating store's inventory) as established in an arm's length agreement between UPRFC and Tahameh. Out of its claim for $130,-000 it was secured, therefore, in the amount of $64,845 ($38,345 + $26,500).

In order for the debtor to sell its property free and clear of the SBA's lien it had to satisfy one of the conditions of 11 U.S.C.

---

6. Section 507(b) reads in relevant part:

(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising ... from the use, sale, or lease of such property under section 363 of this title, ... then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

Subsection (a)(1) of Section 507 deals with administrative expenses.

§ 363(f). A sale free and clear was proper either if the SBA consented (11 U.S.C. § 363(f)(2)) or if the price at which the property was to be sold was greater than the aggregate value of the SBA's interest (11 U.S.C. § 363(f)(3)).

Because the latter condition appeared to be met the SBA consented to a sale of all the property covered by its lien for an aggregate price of $200,000.

But instead of making the sale to which the SBA had consented and which the Court authorized, the debtor made a series of sales, one sale to Tahameh on which the debtor realized $180,000 and a large number of small sales to individual purchasers on which it realized an unknown amount of money. None of the latter sales had the consent of the SBA nor, for the reasons hereinbefore set forth, were they authorized by the Court or the Code.

Whatever the sum total realized by the debtor out of the multiple sales of the property covered by the SBA's lien, SBA as a secured creditor is entitled to be paid off the top for the value of its security, minus only the expenses of the sale to Tahameh which it consented. 4B *Collier on Bankruptcy,* ¶ 70.99 (14th Ed. 1978); 2 *Collier on Bankruptcy,* ¶ 363.07 at 363–29—363–31 (15th Ed. 1984). Accordingly, the SBA is entitled out of the proceeds of the sales by the debtor of the property covered by its lien to be paid a total of $64,845.

In the special circumstances of this case, this disposition will cause the penalty for the deception practiced on this Court and on the SBA to fall on the proper persons. It is not the general creditors who will suffer, since there would not be enough money in any event to pay general creditors. Reimbursing the SBA for the diverted inventory will simply reduce the amount available for the payment of taxes for which the owners of the debtor, who were responsible for the deception practiced on the Court and who most likely were the beneficiaries of that deception, are personally liable. Because of the diversion of the inventory, some $26,500 in taxes that the debtor would have paid out of the proceeds of the sale of the inventory to Tahameh will now have to be paid by its owners.

But even were the result otherwise, this Court would still deem the SBA entitled to full compensation from the debtor for the value of the security the debtor sold under cover of the representation that it was selling inventory, as well as equipment to Tahameh, and that the proceeds would cover the SBA's lien on inventory of a value of at least $26,500, as well as its lien on the debtor's equipment.

■ Although there can be no question but that the SBA and the Office of the United States Attorney have been put to expense and inconvenience by the UPRFC's concealment of the amendment of its agreement with Tahameh, the Court will not allow SBA the attorney's fees it is requesting. The section the SBA invokes, 11 U.S.C. § 503(b), is intended to reimburse a creditor who makes a substantial contribution to a Chapter 11 proceeding which augments the estate or otherwise benefits the general creditors. 3 *Collier on Bankruptcy,* ¶ 503.04 at 503–38 (15th Ed. 1984). The efforts of SBA's attorney benefitted the SBA alone, so far as this case is concerned, and it would not be equitable, as a matter of general principle, to burden the estate with the cost of these services, even though in the special circumstances present here, it might well be.

For the reasons set forth above, UPRFC is ordered to turn over to the SBA out of the proceeds of its sales of the property subject to SBA's lien the sum of $64,845, plus the interest earned thereon since June 10, 1983. That will leave the SBA a general creditor in the amount of $65,155.

SO ORDERED.